The next case for argument is 20-1828, Intel v. Qualcomm. Mr. Saunders, are you ready? Good morning. May it please the Court. The Board here adopted a new claim construction of hardware buffer, not put forward by either party, that excludes a temporary buffer. And it admitted that it didn't find any guidance in the claims that would lead it to this limitation. It also looked to the specification and noted hardware buffer is only used three times and doesn't provide much of any guidance on the meaning there. But still, based on a misreading of the discussion of temporary buffer in the specification, it read in this limitation. Can I ask you to read this? So the claim language says system memory and hardware buffer. That seems to me to imply, in the absence of anything else, the hardware buffer can't be in the system memory. And a large part of what's the substantive point of the specification description of what's going on here is they want to find a way to speed up the movement of the data portion of the software that's transferring from the primary processor to the secondary processor. Mostly by avoiding a second copy process, copy operation. Two times, I think the spec says. What we're trying to do here is to avoid an unnecessary copy operation. And that means the one thing you cannot do if you have a hardware buffer is borrow a piece of the system memory that the processor has to read from and then write to in an ordinary copy operation. And that's what Svensson does. So that, in effect, what's excluded by hardware buffer is temporary use of a system memory for which a copy operation would be necessary. I realize that's not exactly what the board said, but as I think your colleague said a moment ago, not a moment ago, 30 moments ago, we get to decide this question. Right, that's definitely not what the board said. You know, in terms of the directness here, and I would point you towards pages 45 and 46 of the appendix in analyzing some of the other claims. 45 and 46. 45 and 46. The board points out that the 949 patents is no, this is no more direct than what we have in our prior art combination. In our prior art combination, you have an intermediate storage area in one section of RAM. So you're going from the primary processor to that and then to the final location, which is the system memory. It's in the external RAM, physically separate from where our buffer is. Right, but as I read the spec, it says, it acknowledges that's kind of prior art and maybe the key problem, but anyway, a key problem is that if you do that, you have to have two copy operations. Right, but that's no good. You have a copy operation in the 949 patent, you have a copy operation into the hardware buffer, and then you have a copy operation that goes from the hardware buffer to the system memory, the sort of final location where it's going to be executed from. I thought the spec says quite expressively that's in fact not what you have. You don't have a reading of whatever the steps are by the CPU of what's in the hardware buffer. It's passing through without those extra steps. I mean, there is a sort of zero flow section, zero copy section specification, but for this claim where you have the hardware buffer, it's in between. It goes into the hardware buffer where it's temporarily stored and then goes into the final destination. This is why the board, on pages 45 and 46, the board looks at this for some of the other claims and is saying, you know, you're talking about directness of loading. There's nothing that's more direct about the 949 patent than what we have in the prior art here. Let's stipulate that the board says that. Why is the board wrong? You were looking at what the 949 says. Here's the thing that we struggled to do that we have come up with a way to basically double the rate we would otherwise be able to get by not having the processing time of this, what is called an avoidable copy operation. Precisely because it's not addressing the system memory and doing the multiple steps, which I wouldn't be able to describe to you, but doing the multiple steps that takes time and processing power. Right, so it has to do with the headers. So first let me explain why in the face of claim one, you have the multiple cutting steps in the sense that the executable software image starts in the non-volatile memory of the primary processor. Where does it go from there? It goes to the hardware buffer. Where is the hardware buffer? The hardware buffer is on the secondary processor. Secondary processor comprises system memory and hardware. It's specifically in, what's this little something engine? What's the word engine? The DMA engine? I'm sorry, direct memory access? I mean it doesn't, not in claim, just looking at claim one, page 78 of the appendix. Secondary processor, I'm looking at figure three, the physical data type. Oh, the hardware transport mechanism, I'm sorry. Their initial proposal, proposed claim construction, has to be a buffer in the hardware transport mechanism. Isn't that right? That was their construction. Why was that wrong? That was wrong because the only time you see that mentioned is in figure three. Why isn't that exactly what the whole patent is describing when it says the hardware, first of all claim one, hardware buffer different from system memory? It says both. That suggests actually hardware buffer can't be in the system memory. So it's somewhere else. It's in this hardware transport mechanism. And that, the patent says, is what enables you to avoid an extra copy operation. Right. So in our prior, I mean I'll work with the directors, in our prior it is somewhere else. The system memory, the execution of the program. There are two addressable memories in Swenson under the line. Both of them are fully addressable and would constitute system memory. No, they don't. They're always the western piece of the one on the left. This was, no, we have put forward extra testimony at length talking about how the one that was sort of on chip, the first location where the intermediate software buffer is, isn't system memory. It's not where this is being executed from. It's a separate memory that's in between. Just like the hardware buffer in the claim is a separate memory that's in between. And the hardware transport mechanism, I mean that's something that is shown only in figure three expressly exemplary. The board said, you know, we don't think that reading this is being limited to being in the hardware transport mechanism is a permissible construction because we're just talking about one example in the specification for term that is used more broadly. And so if I could get back, the extra copying that's saved, you have to think about this in terms of the headers and the payloads because the complaint that you see, and I can take you through these passages about the prior art, is it's mentioning the temporary buffer. But what it's really complaining about is you're copying the entire image into there. And it talks about in the background section when it's talking about the temporary buffer. It's copying each of these where each thing being copied over has its own header. And so what they're purporting to innovate on here is saying if we have the initial header that comes over, it gets processed. We can know then where everything needs to go. You avoid copying because every time a packet comes over, it doesn't have to have its own header telling you where things go from there. You can just be moving it along. And so you see this, the only time that temporary buffer and hardware buffer are discussed together is in column nine of the specification. And I'm sorry, in line 37, column nine. And it says in one aspect, the executable software image is loaded into the system memory of the secondary processor without the entire executable software image being stored in the hardware buffer of the secondary processor. And a few lines down where it's contrasting says, thus conventional techniques employing a temporary buffer for the entire image and the packet header handling are bypassed. Can I just try to summarize this in my layman's thinking? What you're saying the point of this invention is is that instead of taking the software code with all the instructions and the headers and stuff from the primary processor and requiring the entire thing to be copied into a temporary buffer altogether copied before it starts being distributed to the system memory, this can take pieces of it and then distribute it pieces at a time and you don't have to wait for the full copying to occur. Right. At some point, except for maybe the headers, full copying of all the program code occurs. It's just not all at once, but it all still goes through a hardware buffer to the system's memory. Correct. There's no direct, there's no way to send direct code from the primary processor to the system memory without going through some kind of buffer. Right. It's just whether it's done all at once or in pieces. Right. In this claim, the hardware buffer is sitting there in the middle. Here's my question on that, and I don't know, I think this gets into your prior art and why the construction is wrong, but why isn't it, even if this operates in the same way as a temporary buffer, which it sure sounds like it does to me, the fact that they've created a separate function and denoted it as a hardware buffer, enough to say it's something different. They've dedicated a spot, and I can't even purport to understand how this actually works when you're doing the code, but they've dedicated a spot in the memory of the second processor as a hardware buffer, and that is different than a temporary buffer, just because of the mere physical location. I think this is something maybe Judge Sharma alluded to, that generally the temporary buffers are part of the system memory. The board's construction baffles me because it's not really a construction. It's just saying, well, whatever it is, it's not the prior art, but that's not a very good construction. That's just a shortcut for saying why the prior art doesn't cover this. But assuming, and I'm not saying their construction is correct either, but it at least is more specific in terms of positively defining it. So assuming it positively defines that it's something different, what's wrong with that construction, and then why isn't it not set in the prior art? Even if you require something different, I think at most it's talking about physical difference. Where is the hardware to do this? We have physical difference in our prior art. Our prior art was not where you're going to execute it, you then allocate a portion of that. It has two different memories on the secondary processor. And it may be an intermediate buffer, it may be allocated at runtime, but its job is to do that first receipt, like the hardware, exactly like the plain hardware buffer, and then pass it along to the XRAM in the Svensson and Bauer references where it's going to be executed from. So you have that physical separation there. And the temporary nature of it really doesn't come in, because again, talking about that claim, column nine, when you look at the background section in column two, what it talks about is how do we know the temporary nature of the prior art doesn't make a difference, and that the whole point of doing this as a separate structure, and let's just assume that it's some kind of separate permanent structure rather than a temporary buffer, that that doesn't somehow create an efficiency that you don't get from a temporary allocation of a buffer. I don't think we have anything on the right. I mean, we do have the problem in this case of the board adopted its own construction in the final written decision. So part of what we're talking about in the second part of our argument is we never had a chance to address this temporary buffer construction. I think you can see from the briefs that the parties are fighting over even what is meant by temporary. In your – what did your – I guess either your petition or your expert say about whether in Svensson the – under the line, the box on the western side, which has itself an internal division, a piece of which is allocated for what it – say about whether the box on the left is part of a system memory in the Svensson system. So our expert did address this, and he posed a link about this because the parties were fighting about system memory. So if you look at pages – page 2084 of the appendix, it talks about the intermediate storage area being physically distinct and located in a different physical device as the external memory where the system memory is. Page 2833 – I'm sorry, you were reading 2084? We're in particular, and maybe you don't – you're probably reading from something else. So if you're looking at the middle of the – Lines 19 to 21? I'm looking for the phrase system memory. I see it there. Right. I mean, really the whole page. Beginning at line 3, he says I've identified the XRAM as being the system memory. He's asked whether that's the same or different structure from the hardware buffer, and he's then answering that next block in the middle of the page that, yes, it is. The intermediate storage area is located, so these are physically distinct structures. What are physically distinct structures? The intermediate storage area in figure 1 is physically located in a different physical device as the external memory where the system memory is. So clear expert testimony, and he circles back to this at 2833 and 2835 about being asked and emphasizing that this code is being executed from the XRAM. That is what we are relying on as the system memory, and there's this entirely different buffer in the middle. And, yes, it may be an intermediate storage area, but it falls within the broad definition of hardware buffer. And this – Can I just stop you there? Suppose I find the worst construction of hardware buffer as not a temporary buffer completely unhelpful in determining how to judge the obviousness arguments here. What construction of hardware buffer should we be using? What does it mean? We think that it's simply the way the board looked at it in its institution decision was it's a temporary storage buffer, and is this in hardware? Is there a physical component associated with it? Somebody said – no, I don't remember where. Maybe it was your – well, what you just said, since we live in a physical world, how could there possibly be storage in anything but hardware, making the word hardware superfluous? And something we pointed out in our opening brief then is we said that if you look elsewhere on the patent, we looked – let me find the citation here. Column 5, lines 20 to 22 talks about the hardware loophole. So this is a patent where you have the word hardware appended to things that have a physical embodiment. Everything with computers has a physical embodiment if you're storing something. So what work is the word hardware doing there? So I think from that example that we're seeing is I'm not sure the word hardware is doing distinct work here. You know, this court has had cases that has said that the rule against surplus age is not an absolute rule, and we're not going to sort of let that change. It's certainly not doing the work of saying it's a buffer implemented in hardware as opposed to other buffers that are not implemented in hardware, because I assume even a temporary buffer is implemented in hardware at some point. Yes, it would be. It's fairly common, and we have a lot of cases to say this can be implemented in software or it can be implemented in hardware, by which is meant one can create etched circuits that do a particular job without having to give it an instruction. Why isn't this one of those? So that hardware buffer means we're not – it means the opposite of software-controlled buffer. I don't think that that construction has been offered by Qualcomm. That certainly isn't – you know, when they were accusing the devices in the litigation against Apple, they were looking at a random access memory there, so they were not looking at someone's – So the accused devices are RAM devices? The accused devices had RAM. They were looking at the buffer portion. Right, the buffer portion was the RAM in the direct memory access circuitry there. So it wasn't hard etched into the – Right, I just wanted to clarify that, because that, I mean, is at least one way I understand the distinction between hardware and software also, but it didn't seem to me that anywhere in this patent they were suggesting that they were specifically etching into a chip somewhere a hardware processor that does this transferring thing. No, not at all. I mean, if that's the construction, do you have a problem with that construction? I'm guessing that you probably, in the end, win it for infringement. It probably wouldn't solve your invalidity problems, but I can't imagine that any of you use devices that have the buffer actually etched into the chip. Right. I'm pretty sure your friend's going to get out of hand. I think it's going to create big infringement problems for them. I mean, I'm hesitating because I don't want to overstress the BRI standard, but we have the BRI standard for a reason, and part of it is the clarity enforcing function it has here, which is when we're in a proceeding like this where there's an opportunity to amend, if we have readings of this that are both reasonable readings of it, then we should go with the broader one compared to the prior art, and if they then wanted to clarify. I'm sorry. Your reasonable reading is the one that simply erases the word hardware. It doesn't erase the word. Maybe that's right. Right. It has to be implemented in hardware. It may be implemented in hardware unless you mean hardwired. Right. It may not make a practical difference. It may be that that is in the claim to signal some sort of physical separation. That would be something that wouldn't have to be resolved. And suppose I thought you don't need to go any further, or the right claim construction for BRI is simply not in system memory. Suppose we can't actually get anything more out of it than that, which seems apparent on the face of the claim. What happens to this case? I think the minimum you'd have to remand at that point. We did present our evidence below as to why we think this wasn't in system memory. To answer the question how to characterize what constitutes system memory in census. Right. There wasn't an ultimate construction of system memory. The board did not answer that question. The board did not answer that question, did it? It didn't. No. And, you know, something else. Well, it did to the extent that when the board was looking at the face of the claims, it concluded at Appendix 13 that recitation of a separate system memory by itself does not foreclose the possibility of implementing a buffer in some other system memory. So it was raising the question of are we talking about the system memory singular or a particular sort of part of the system memory, you know, where this is being executed from. And I think that gets significant, too, because if you think about the dependent claims, right, we're talking about Claim 1 here. The dependent claims then come in and say without the copying operations within system memory. So I think that the idea that system memory is this unit and that there can be sort of no intertwinement is tough as a construction of hardware buffer because you don't really see that introduced, no copying within system memory until the dependent claims. And you have the board looking at the face of the claims and saying this term by itself doesn't foreclose that possibility. Now, we think as a factual matter, this is not system memory. There's a clear distinction that the intermediate buffer in our priority is allocated. It is not deallocated. It is not used for anything else. It's not used to run the software when it's being executed. So we think we clearly win factually. I'm hesitating about going straight to this distinction of system memory for the reasons that I'm saying. And the concern is are we collapsing the independent claims and the dependent claims. I think what you have is a situation where it is just a very broad term being used as hardware buffer and we shouldn't sort of bend over backwards. And I think this is what the board was doing here. You have to find some meaning for hardware here, some meaning for hardware here that will distinguish it in a way that then we shouldn't bend over backwards to do that in a way that's then going to blur the distinction between these claims. And I guess I probably am already beating a dead horse. But it seems to me that the one thing you can get pretty confidently out of the claim is that the hardware buffer must be a physical space different from system memory. Otherwise, it wouldn't be referred. Right, you have to transfer directly from hardware buffer to system memory. Right. We are fine with a physical distinction there. And then I think you have a second-order fight over what is the system memory. We clearly think that is where the program is executed from. And so for all these reasons, I think what we're talking about is the board temporary buffer construction is untenable. And as we argue in the alternative, even if it were, even if you were to somehow agree with that, we really didn't have the opportunity to address it because it's coming up late in the construction. I know I'm well over my time. I know. I'm wondering if I should ask you about standing, but we can wait until we reply. I'd be happy to address it and reply if there are questions. So we're obviously going to be very generous in time, assuming there will be questions. Thank you, Your Honor. I appreciate that, and I'm happy to engage the court on your questions. And I'd like to start with standing because it is a threshold issue, but, of course, I will then be sure to take plenty of time to address the claim construction conversation Are there distinctions between the standing argument in the last case and in this case that you want to emphasize? Yes, there are, and I can start with that. I do want to put a pin on the fact that the evidence here is just as vague, if not more so in general, for Intel's standing claim. But there is an independent additional argument really at the threshold that we think this court should consider in determining that Intel does not have standing to bring this appeal. And that's because Intel has not provided any evidence that it makes a product, that it has ever made a product, that even arguably might meet all of the limitations of any claim of the 949 patent. And really under just basic doctrine, when there isn't even any sort of showing that it has any product that might infringe, and it's trying to say it should come in court because it fears an infringement suit. And this case differs in that respect from the other case. Why? Because, Your Honor, it goes to what the claims recite. And here, the 949 claims recite multiple elements, and Intel has not pointed to any product that it makes, that it's ever made, that was used in the accused Apple product when we sued Apple. There is no product that Intel has pointed to that it could potentially even have any sort of fear of meeting all of the limitations of any claim of the 949 patent. And forgive me if I'm confusing cases. Could it not be charged with inducement? Theoretically, but it still needs to come to this court. This is one in which either some or all of the claims actually require two things, and Intel makes one of them, but it gets put together by Apple or whoever with the one they make. And on the assumption the one that they make doesn't have to be put together, there's no contributory, but inducement seemed, I think I'm on the right case, right? The inducement charge was the one that I guess as I was reading the briefs, I was thinking, why is that not an obvious risk? Let me give you a couple of reasons. One, Intel, this is at page 50 of its opening brief, makes just the most conclusory statement that maybe there's some risk of induced infringement. It doesn't substantiate that. We don't know who the direct infringer might be, what the direct infringer's, suppose the direct infringer's system is. Application processors, first processors, secondary processors are different. And Intel hasn't demonstrated that its products have any risk of being used in combination. The Qualcomm suit against Apple was part of the charge of infringement, a component of the, I guess that's about iPhones, right? Anyway, the Apple devices that included an Intel processor. Yes, and we're not disputing that. So the other case actually, the Intel one might even be directly infringing in the usual sense because you don't need a second thing. But in this one, you need a second thing, which led me to think, so why if they know what it's going to be put together with, is there not a serious risk of inducement? And you've already accused the device based in part on that device of meeting these claims. So a couple of responses with respect to this case. First, that case is four years old. And so on that basis, it's stale. We have settled with Apple. We brought a lawsuit against one party. Intel is now trying to get into the Article III door by pointing to an old, stale case. And the second point I want to emphasize is that Intel does not substantiate an induced infringement risk. This court's decision in Microsoft versus DataTerm made clear that the court looks at potential infringement liability in two respects. And each one is on an element by element basis. The first is, what is the cause of action? Induced infringement, of course, requires more than direct infringement. It requires an affirmative action sort of encouragement. And the second is that you do look at it on a claim by claim, element by element basis. And what Intel points to is some testimony vaguely referring to some documents. It hasn't even put in those documents. And they are old. We don't know if Intel is still even making those documents, providing them to its suppliers, even using the same sorts of processors that were at issue in that suit. This is a rapidly changing... In the previous argument, there was some discussion of FIBO something? That's right. There's no mention of FIBOCON in this case. FIBOCON, FIBOCON, I'm not sure the name of it. So in that sense, this case has Intel's declaration, its evidentiary support that it put in an attempt to establish standing, lacks the specificity that this court most recently in its Apple versus Qualcomm decision said is inadequate. It is the petitioner's burden. Of course, they can file an IPR. But to come into an Article III court, it needs to actually give this court a reason to adjudicate a legal controversy that it has with the patent owner. It needs to be specific to the party and specific to products. We don't have products named here. We don't have who the purported customers might be. We don't have any sense of how Intel's baseband processors, which is the generic term it consistently uses in its declaration and in its brief, how those might at all risk infringement of any 949 patent claim. I guess just to reiterate on the Apple suit, it was four years ago. This is a rapidly changing technology. The burden is on Intel in any circumstance, but certainly here to establish that anything it's doing now might have any nexus to what was at issue or what was involved in the Apple case. And the final point there, again, the documents that Intel is pointing to are not in the record. But there's certainly nothing wrong with this court in Microsoft versus DataTerm said in bringing a suit against a particular customer or user, which is all that Qualcomm has done here, not against any other party, whether Intel or any other supplier. And the fact that we used some Intel documents to substantiate a portion of our infringement suit against Apple products and against Apple that Intel hasn't even put into the record is nothing remarkable. We were using relevant evidence for particular components, but not anything that would put Intel at any risk of an infringement suit. What does it matter if it's Intel at risk of infringement or one of its customers? If you're going to sue its customers based in part on their products, its customer is either going to face infringement liability or they're going to stop buying the Intel product because it's going to infringe your patent. Isn't that enough? I understand your argument that they haven't made that showing, but if they have made that showing, if I think that their declarations and evidence are sufficient, isn't that enough, that Apple might stop buying these Intel products because you sued them once on it, and you might do it again? Respectfully, Your Honor, I don't think their declaration is enough, and I think here the passage of time reinforces that. Let's just assume the declaration does provide that. Isn't that a legally sufficient basis for standing? You seem to go back and forth in suggesting that Intel hasn't shown that it can be sued, but I don't see what difference that makes if what's going to happen is you're going to sue Intel's customers and they're going to either have to pay infringement damages based in part on that, or just stop buying the program. Number one, we don't have any allegations from Intel that that has happened, that it has been written. Okay, let me make it clear. If those allegations are in the record, and that's an actual scenario I think is sufficiently presented, is that enough to establish standing as a matter of law? Your Honor, I do think that would be a closer case. I still think Intel, under Microsoft versus Data Terms, would need to provide some sort of evidence, even if it's in a declaration, that it is engaging in all of the elements of a cause of action that would go to the indirect infringement of the inducer. But it is true that Intel hasn't even made any argument that it's been affected by the Apple suit, and we have enough time here for that certainly to have been established and put in Intel's declaration. If there are no further questions on standing, I will turn to the claim construction argument and see if I can touch on the various points that were raised. Let me start with, I think, your inquiry, Judge Toronto, and the point of the hardware buffer. And I think this also goes to your question, Judge Hughes. There are different ways that the Board could have defined or given a construction to hardware buffer in order to resolve the dispute that was before it. I think one to say it's not created in software at run time would be sufficient. What the Board was doing was using the term in the patent that the patent juxtaposes each time between a temporary buffer. Can you go back to what you just said and explain that? I didn't quite, I mean, I understood it. But what do you mean that hardware buffer means it wasn't created in software at run time? Sure. So at column two of the patent, the patent is just starting out by describing, let's talk about the prior art and what prior art techniques were used. I don't want to talk about this in terms of how it's distinguished over the prior art. I want you to give me a definition of how you think this patent defines hardware buffer. And what you just said sounds to me like a definition of that, but I'm not sure what you mean. Do you mean that this patent has created a hardware buffer in software? Because I'm pretty sure you're not going to agree that this is etched into the chip as a hardware buffer. But that it is created permanently and not just at run time. Is that what you mean? Yes, your honor. I really, I don't want to venture into etching that's not part of the record and I don't want to start opining on something that an expert should have opined on. But that is exactly right. You're not going to propose the notion that this hardware buffer is actually etched into the chip as software. It's still implemented through software. Because that's what you just said. I think what you're trying to get at is there's a difference between being implemented in software at run time versus just implemented in software. Am I using the right word when I say permanently? This is what I don't understand. This is what I think is key for us to understand in terms of how we view the prior art, too. Let me see if I can answer that. The hardware buffer, I think the best way to think of it is that it is permanently existing on the chip. It is pre-created and will always be there. You turn your phone on or off and it's always going to be there. That's part of the contribution of the patent. I'm sorry, can I get more specific? Something that is physically on the phone is always on the phone. I don't think that's what you mean. I think you mean, or that's not making a distinction. You mean that that piece of physical space is permanently dedicated to this task? Yes, John. Is that what you mean? Yes, I think we're saying the same thing. Yes, it is permanently dedicated. It's not allocated each time you're trying to boot up your phone. You're not having to spend part of your secondary processor taking time and creating the space so that then you can have data go into it. It's already there. It's already in the structure of the phone, of the multiprocessor device. And that's what the patent is distinguishing, that one way of performing such loading, this is at column two, is to allocate a temporary buffer. Again, really at the end of the day, every buffer is going to be part of hardware, but what does the patent say when it's distinguishing temporary buffer versus hardware buffer? And this goes to, I think, a premise I'd really like to clarify and correct, because there is no plain and ordinary meaning of hardware buffer. Intel has a single evidentiary site for its view that this court can rest on any buffer that's implemented in hardware. That's the statement of its expert, that's Appendix 1797, Paragraph 25, the most conclusory statement that simply says a hardware buffer is a buffer implemented in hardware. The board was correct, that doesn't give meaning to the term, and there's no dictionary definition. You'd think there'd be a manual, a treatise, a textbook, something that Intel would have offered. So that's the wrong premise. We have to look at the patent and see how does it distinguish hardware buffer from temporary buffer. And while there could be other definitions and other aspects to the claim construction, what the board, by the time it's wound its way through trial, there were other terms that were being proposed by the parties as what they might mean, and some of the definitions that were offered were offered in relation to those other terms. But when it got down to it, for these claims, Claims 1 through 9 and 12 that recite hardware buffer, other claims do not, for these claims the board said the patent uses a distinct term that differentiates from the prior art temporary buffer. You don't have to go allocate it each time you're going to load up. It's already there. That's part of the savings and the efficiency in getting this data moved over. You've already got this dedicated space, to your point, Judge Toronto. I think we understand each other, but I can't tell you how important it is to me in thinking about this, in getting from incoherence to coherence, is the word dedicated, or the concept dedicated. Dedicated, I think, is... Physical things are not being created in this process, right? I think the dedicated space, whether we think of it as a... Again, every buffer is implemented in hardware, and the question is, has it already been a dedicated space, or is it dedicated anew each time, therefore allocated anew each time, therefore a temporary buffer? I hope I've answered your question. Can I just... Let me ask you a hypothetical about that, to make sure I understand. I think this is important, too, and I think this is, at least, demonstrating to me why the board has not fully explained this in a way that allows me to assess the prior art. When you say dedicated space, let's just say you have a secondary processor. You're not saying, are you, that by dedicated space for... The hardware buffer, that there's... Say there's a chip for the system memory, and there's a separate chip for the hardware buffer. You're not saying it in that term, are you, that there is a specific dedicated chip devoted only to the hardware buffer. We're talking about two different memory places. One is system memory. Maybe something's another system's memory or has some other name. Are you saying that by using hardware buffer, you're saying it's a sole physical piece of equipment dedicated only to... And by equipment, I mean something you could pluck out of the phone and say, this is the hardware buffer. That's not what you're saying when you say dedicated, right? I think it could be both, but I think it is decisions... Okay, but if we're under BRI, then the fact that it could be both means it doesn't have to be a chip. It doesn't have to be physical. It can be a dedicated part of the secondary processor's memory. Right, Your Honor. And again, for the board to evaluate Intel's prior art combination, which was relying on Sensen for this piece, it's enough to know that it's not... That the hardware buffer is already dedicated. Unlike Sensen, and if you... I don't... The problem is the board's construction does not give me any firm confidence that they understood that this is what they meant, that it would have to be a dedicated portion. It seems to me they were just saying whatever hardware buffer is, it's not a temporary processor, and therefore the prior art doesn't cover it. But it could be that there's a middle ground here that the prior art is using a dedicated space also that's distinct from the system memory to do this data transfer, and that it may use different words than hardware buffer. It's doing the same thing, and that it's also, in some sense, dedicated. Why isn't it right for us to come up with a better claim construction or tell the board to come up with a better claim construction that aligns with what you're arguing to us today about a dedicated space for the hardware buffer as just opposed to saying what it is not? A couple of responses, Your Honor. I think... I don't think this is the sort of negative limitation that ultimately isn't helpful when we look at the context of the board's decision. And it's saying it's not just that it's not a temporary buffer. It's not something that's allocated while the program is running, is loading. Well, I think you started off with that, and I found that very helpful. But why isn't that in the board's claims instruction? Because I don't get that from not temporary. I think it is in the board's analysis and is essentially what the board is saying when it says not temporary. It was using the term from the patent. I think the board could have said it's not allocated by software, which is, you know, sort of opposite of hardware. It's not something that's... It's not something... A hardware buffer is something that's already been dedicated for that use all the time. There are other ways it could have defined the construction, but I don't think it requires any remand because regardless what Intel relies on, and this was critical to the board's analysis, it looked at what Intel's prior art was disclosing. And while Intel counsel says there's two separate things, that's not the inquiry. It's not whether there's two separate things. That's not the level that we're looking at this. The patent makes clear, it's not just that it's something different, it's what is it. And it is something that is fully dedicated for this particular feature of taking some of the data images before it gets fully transferred into the system memory. I think there are ways to define it as we proposed as contraindicated from system memory or from software. But the fundamental rub... Wait, can I just stop you? Because this is... Every time you say that it strikes me as somehow imprecise and incorrect, when you say distinct from software, I get distinct from system memory, that's fine. I think your friend would say there's a system prior art distinction. What do you mean when you say distinct from software? Let me be precise. Because it's not distinct from software in some senses. This is using software to code a hardware buffer. Unless you're going back to saying this is actually a physical chip that is solely dedicated to hardware buffer, which I can't imagine you're saying because I can't imagine anybody's products would infringe because who has room in a phone for a chip dedicated to hardware buffer? It's somehow implemented in software, isn't it? Your Honor, I think there may be sort of software involved at some point, but the point is... Sorry, I'll let you finish. But let me just emphasize, the real problem for me is when you say the word hardware buffer, you're not using hardware in the sense that we traditionally understand it as some kind of physical hold-in-your-hand component, are you? This may be where there's been some confusion. I don't know that it's at the chip level, and that's not our point. If you look at Figure 3 of the patent, it's part of a controller, a physical thing. I do think there is an argument that it is a physical portion of this device. But how does it get to be a physical portion? Is it because it's some kind of memory or whatever you call the computer processing power that is coded through software to be the hardware buffer? In that sense, right, software is involved. I don't mean to say that there's no software. That's why I think you need to be precise and also why the word hardware has no real meaning here in the sense that we traditionally understand it, at least why I'm struggling with it. Because even you acknowledge that it has to be implemented through software in some sense. So the board's construction is not really helping me very much. It is not being implemented by software each time you load up your phone. So if your phone is turned off, you're not having to implement... It's being implemented by software one time when this whole thing is created as part of the programming, and it's always there. That's correct, Your Honor. Why don't we have a claim construction that says that? I think there are other constructions that would be the equivalent, such as permanent, fixed, preexisting, preallocated. Any of those I think are synonymous and would get to the same point and would be the critical distinction from the art that Intel was asserting. Because in Fenton, you see that no matter what hardware buffer means, any of those definitions or options, in Fenton, you clearly see in Figure 2 that it's getting what they call the hardware buffer. What Intel accused of the hardware buffer, the intermediate storage area, isn't created until halfway down the process. But the patent says we're distinguishing those sorts of temporary buffers that are allocated while you're loading up because we are disclosing a hardware buffer. And I think in that sense, hardware and buffer, in the context of the specification, the full context of the insurance given, those are antonyms and offices. I understand what you're saying, but the real problem is it sounds like to me an awful lot like you're saying, even if the board's construction is wrong, whatever construction you come up with, you can just look at this part of the art and determine that it doesn't render this obvious. And there's no way that I can figure out how to read Fenton with the new construction with the aid of the board's analysis. I appreciate that point, Your Honor, but I don't think... I'm not at all walking away from the board's construction. I want to reiterate that the board's construction here was sufficient for the dispute before it that Intel brought before it. I do think, based on the reading of the patent, the full intrinsic evidence, and each time the patent distinguishes a temporary buffer and a hardware buffer, it's not just saying it's not a temporary buffer and we have no guidance. It says it uses that as a distinct term to differentiate the art, and the art is allocating this buffer, whatever we call it, allocating it while it's running. Are you saying that even though the board, when it says it's official claims construction, it just does it negatively, it has implicitly imposed all of these qualifying conditions we've been talking about for the last ten minutes about permanent and only done one time and not every time it's shut up and things like that, and that's how we can understand what the board's claims construction meant? I think that's a fair reading of the board's construction, including in our STIR reply where we made this distinction between a permanent buffer, which is a hardware buffer, and a temporary buffer that's exposed in the acquired art. In our STIR reply where we made that distinction is that Appendix 4397. Can I ask you a question which may not actually bear on, at least directly, what we've been talking about? Can you explain to me, in terms I might understand, how a copy operation is avoided in this system compared to what the patent describes as the prior art? Yes, Your Honor. I think this does go to the same issue because you're not tying up the creation of copying in the software, both in creating the buffer and having some of your system memory that's where the temporary buffer is have to be tied up with the copying. It is the sort of wishing through the hardware buffer that's already there and is not tying up the software to then get it into your system memory. So that's what the patent calls the zero copy transport flow, and it is, in critical part, based on the hardware buffer that is already there and is not burdening the processor to create the buffer or to use its own system memory to do that. It reserves that. It doesn't tax the system. There are other reasons you wouldn't want the hardware buffer because having more hardware on your system can be heavier, can have complications,  of what Qualcomm did in the combination of aspects and features presided in this claim. Thank you for the additional time. If the court has no further questions, we would ask the court to dismiss for lack of standing. I know Mr. Saunders didn't talk, but we have this little lingering issue about, was it Claim 16 and 17? Yes. Do I understand the state of play as follows? You said there is sufficient structure. Intel, you know, Intel originally said it thought there was sufficient structure. It changed its mind and said there is not sufficient structure, at which point the board, rather than deciding whether there is sufficient structure, said Intel had to show that it was. It loses and loses with a, let's call it a merits judgment that would trigger a stop. Is that? You have that correct, Your Honor. Okay. Is it your view? Well, let me discuss this. Why should we not send it back for the board to answer the question it didn't answer, which is whether there is sufficient structure, precisely so that, which is a legal question, not a factual question, and precisely so that a party in Intel's position, never mind whether Intel did this, doesn't have the power to essentially regret including certain claims in the IPR and effectively take them out of the IPR by making a concession that then gets the benefit of our Samson ruling that there's no estoppel when it's impossible to understand the claim for prior comparison purposes. Your Honor, first, Intel, this was within Intel's control. We're not in a situation, as in other cases, where the petitioner was sort of at the behest of the board and what the board ultimately found the claim to mean. Intel and the board relied on this, on its own rule that puts it on the petitioner. If a petitioner is going to bring means plus function claims into an IPR, Rule 42.104 specifically says that petitioner needs to identify a corresponding structure. And Intel, as you said, in basically quitting on its own case, but still keeping the claims in the IPR, the necessary consequence under this court's decision in Cochlear Bone is that Intel, the board is entitled to say that Intel has failed to meet its burden. It just withdrew essentially the corresponding structure that under the board's rule required Intel to point to. And Intel hasn't challenged that board rule. So I don't think this is a scenario that's going to arise in other cases. Is there a formal mechanism for a petitioner to remove certain claims from its petition so that there's no final written decision on them? To my understanding, first, of course, Intel didn't have to bring them into the IPR, but it did and it offered corresponding structure. It could have defended that when the board's institution said, institutions... It's your question. I do think there is an opportunity for Intel between filing a petition and at least before the institution decision to say it's withdrawing claims, and we didn't have that here. What if Intel had defended its structure and the board had found no structure? What would have happened then? The board would have just said, we can't determine patentability and dismissed, right? I think the board would still have had to say that Intel didn't carry its burden because in understaffed... That can't be right. If they're not going to address patentability after Intel has tried to show that they're structured, that... Isn't that Samsung? So, Samsung is a little bit different because Samsung involved a type of indefiniteness that this court said the board could address, this IPXL, IPXL, where you have sort of a mishmash of different types of method and apparatus, right? If the board can't ultimately find the corresponding structure, again, that's not the case because that's not what the board found. The board rested on Intel's failure to support any corresponding structure. But I think in the scenario where the board ultimately can't find corresponding structure, the result under SAS Institute is still sort of basically an up or down vote as the petitioner demonstrated that those claims are unpatentable or not. And if the board can't even assess that analysis, which is the Copperbone scenario, then in that final written decision in Copperbone, just like here, the board said, we therefore cannot find that petitioner has carried a burden in demonstrating patentability. I acknowledge that in Copperbone there's a separate question of estoppel in that circumstance. I do think that's a premature question here, but also fundamentally different here where Intel offered corresponding structure and then basically reversed course. It could have supported that corresponding structure, but this is no fault on Qualcomm. This is on Intel and its regret or its strategic choice. Or its recognition that it couldn't prove its case and willingness to let the board not go through an unnecessary exercise in determining that there was no structure. Respectfully, Your Honor, if that was Intel's position, it should have made that assessment before putting the claims in the IPR and continuing with them. Well, I mean, maybe they had good faith then and they changed their minds. I mean, I think you're putting them into a trap when they decided they couldn't show structure. And the alternatives seem to be to force them to go through an unnecessary exercise or stop them. And neither of those seem correct. If I can thank you again for the additional time and I can just answer that. I do think there's two different consequences from Intel's conduct. One is by putting the claims in the IPR and not following the board's rules. The board was fully within its rights, consistent with Coughler-Bone, to hold that Intel did not carry its burden and therefore could not find Claims 16 and 17 unpatentable. There's a separate consequence that Your Honor raised about estoppels. We think that's premature here. We think there are reasons why under the plain language of the statute, even in this scenario, Intel would have stopped. But we're not asking the court to decide that. But we do think it is a different scenario when given Intel's change of position than when it's the board determining there isn't sufficient corresponding structure. Okay, thank you. Thank you. Okay, well, we're not compelled to keep it even, but to the extent we're trying, you get eight minutes on rebuttal if you need it. And you want to start with Dan. I'm sorry to interrupt. You've been very patient. On standing, Qualcomm asserted this patent targeted Intel by suing its largest customer twice with the goal of trying to drive Intel from the market. And the relevant Intel component in that case was the XMM7360, is that right? Right. Does FIBOCOM sell that? It's the same part being supplied to FIBOCOM, but it's a line of the baseband processors. It sort of depends on which iPhone you're talking about. I guess what I'm trying to figure out, in the previous case, you said FIBOCOM is actually selling this RF transceiver. Today, forget about Apple in the past, today, FIBOCOM, is that true about the modem that's relevant to this patent? Yes, it is. But our primary focus here has been on Apple. The litigation history. Right, the litigation history. And just two things to point out. One is, if you look at Claim 16, every element of that claim is at or by the secondary processor. We were the accused secondary processor in the patent. And then when you look at the trial record, we put in the trial transcripts, and what you see is them saying, identifying our... But all the other claims require somebody else. They require other things. Some of them actually are method claims that require somebody to actually practice it. Right, but then when you look at the trial record, they identified at 6264, 6265, they identified our processor as the secondary processor, with all the components there. And then, as we discussed in our brief, repeatedly looked at the Intel design documents to show the integration here. So, you know, 6262. These are Intel design documents that describe how the Intel baseband processors are integrated into the iPhones. 6264, they're looking at, quote, hardware block diagrams of how you would... Right, can I just... I'm sorry. I think I understand the lay of the land looking backwards at the Apple thing. I'm really interested in this FiberCon business. Do you have a declaration saying, or even a portion of your brief in this case, the way you did in the other one, that referred to FiberCon? We do not refer to FiberCon by name. What our declaration did, it talked about the past enforcement of Apple. It said we're continuing to supply same processors for the same iPhones, which are still being sold. And then it said we sell to another customer. We did not, in that declaration, name FiberCon. And that there are concerns here because we think the reason we're doing this is because we think we are going to be that infringement target. And we're talking about a suit against Apple that ended only in 2019 and where we were the real target there. Just very briefly on claim construction, I think that what we are hearing today is probably the third or fourth iteration. Well, unless what we just went through, at least I'll say me, went through was a complicated roundabout process to get to what, in slightly different words, the board actually did say, that hardware means there are physical locations that are permanently dedicated to serving this buffer function, which is to say the opposite of temporary allocation, which is what the board said. And maybe it took us, or at least me, rather a long time to get there. But I think Qualcomm's argument here is in effect, that is actually what the board said, but using the negative words, which can easily be translated into the positive words. I don't think that, I mean, the board certainly didn't make that clear. It didn't talk in terms of allocation. And I think the question I would ask is, where are we getting that from the patent? Because the distinction, the discussion of temporary buffer, you won't find a statement in the patent that says don't use a temporary buffer because you're gonna slow things down allocating. The allocating is just this initial step done at runtime. It's allocated. And then in our prior art references, it's there and to be used. What their focus is, is they're saying, don't copy the entire image, don't have the headers in everything, parse the header first, and then you can be doing this more direct copying. And so every instance, the background description of the temporary buffer. So are you saying that if we, that their assertion that this is somehow one time pre-allocated, that would be an incorrect claim construction too, not consistent with the patent? Yeah, I just don't. The patent doesn't support one time pre-allocation. Right, exactly. I think we're, that is sort of a new justification that's not flowing from the specification itself. And so again, I come back to the broadest reasonable interpretation standard and I feel like we are cycling here in claim construction, searching, searching, searching for what the meaning is and this is the circumstances where I don't think we are seeing one that is compelled over the other. This is the circumstances where they are the least cost of labor. This was their patent. We're the ones who were being, having our customer be sued under this and so the proper thing to do forward is to go and give it that broader construction and not be trying to sort of rewrite it on other things that they might have claimed had they used different words. And just with your doubts, if I said one thing quick on claim 16, I didn't want to burden you. What we did in the petition, we said our customers have been sued in the ITC and we are challenging these claims under the very claim construction that Qualcomm was using in asserting the patent against us and we put, you know, the Joint Appendix has their claim charts from the ITC in it. The board then at the institution says, we're not so sure we see the corresponding structure here. Qualcomm then came. And Qualcomm's construction in the ITC that you attached was a 112F construction or not? Yes. Everybody agrees it was a construction. The only question is, can you identify the corresponding structure? And we looked, you know, it's their patent. They presumably did the best job anyone could do to identify the corresponding structure. We offered that. I mean, there's no, this isn't the Alacrit case where there was nothing in the petition. The board's enforcing a rule about what is or isn't in the petition. The petition said the corresponding structure is this. Board expressed doubts on institution. Qualcomm then comes in. It continues to defend what is ultimately its construction, but then also defended on other grounds. It basically said, we're going to rely on distinguishing the prior art on things other than those elements. It comes back to us and we say, you know, we're relying on Qualcomm's construction. We don't think you have to construe these claims because the only grounds in which they are defending are other points. So you wouldn't need to construe them. But then we did concede and candor to the board that it seems to be right in terms of the difficulties of this patent. This business about whether it doesn't, it's not feeling symmetric to me. It seems to me they can defend against prior art by saying element C is missing. And so it doesn't matter if we understand what element C means. That's the means plus function, but you can't do that. Well, you need to show all of them. We do. And it's shown all of them under the construction we offered in the petition under their construction. And, you know, in candor to the board said, you appear to be right about the problems with identifying corresponding structure here because that's a problem with the patent itself. And so I think this is a Samsung situation, you know. If we had just sort of stayed silent and said, no, we're offering their construction, then we would be in a place where the board would just, it would have to decide, well, can we construe this or not? And the only thing that's different here is the board itself had already said we are really having... Yeah, they didn't have to go the extra step. I mean, he had said that in institution, but don't we need the board to have decided that there's no structure, there's no corresponding structure. Right, and that... They did not do that. No, they didn't do it. And that's what they should have done rather than saying they are in agreement with their initial assessment and then that we hadn't carried our burden and so now they will enter a final written decision against us on the merits, potentially triggering a stoppable. When we were just agreeing with them, they should have then completed that thought. They should have either looked at the claims under the construction in the petition and the Qualcomm was defending and analyzed against the prior art or they should have said we can't do that, we can't reach a construction, in which case we would be in the world of the Samsung case and it would be inappropriate to say this is a failure on our part and that there's a stoppable. So that's all we're asking for. They need to complete that exercise and come to that conclusion rather than turning around and saying this is a failure of proof because even though it wasn't petitioned, even though Qualcomm was still defending it, you agreed with our preliminary assessment. And so why is your scenario, which maybe is arguably compelling about how things went down here, is that completely responsive to what your friend on the other side said, which is this is the board's procedure. You make this assertion and you have to see it through. The board's procedure is in terms of what has to be in the petition. That's the rule it cited and this was in the petition. We didn't go into this and try to argue indefiniteness in the IPR. We went into this and said this is the construction. Essentially, this can be construed at all. This is their construction. Here's how it's met by the part. They're then defending that and by the time we say anything different, it's not a failure or an absence from the petition. It was simply an agreement that the board in its assessment acknowledging the board had a point. The board had looked at this and said we are concerned about this corresponding structure and there really wasn't a way to do better because we're limited by what's in the patent. There's no way of just saying our customer is being sued on this at the time. We're doing the best we can to get the IPR with their construction while also being candid with the board. It's going towards the opposite conclusion and saying we're struggling to construe this and the board should have continued down that path then and said we can't construe these and we'd be in the realm of Samsung and there wouldn't be questions. Or maybe once they looked at it, they may have decided they could construe it and then we'd have to go through an appeal with that again. It would be a possibility and I don't think there's anything else. If it's not the Qualcomm construction, then I don't think they're going to find corresponding structure. One quick question to which you might not be able to answer this. Regarding standing, if these patents, this one and one of the previous case, end up getting struck down, would that have any effect on the capital Qualcomm agreement? I'm not privy to the Qualcomm agreement, so I don't know. Part of the point is we're not a party to that agreement. It certainly would have an effect on us and the piece that we take care of and the certainty going forward. We're talking about acts that have already been done. We're still within the statute of limitations for them and we're basically continuing to make those exact same sales today. Thank you.